## KRAUSE *v.* OREGON STEEL CO.

[77 Pac. 883.]

OBSTRUCTION OF WATER COURSE — IRREPARABLE INJURY.

1. Obstruction of a river, materially impeding the flow of its waters, and consequently the drainage from low lands along and near its course, materially retarding the planting of crops thereon, is an irreparable injury, authorizing equitable relief.

OBSTRUCTING WATER COURSE — QUANTUM OF PROOF.

2. In a suit to enjoin the obstruction of a river, whereby the drainage of adjoining lands is retarded, the plaintiff has the burden of proof only to the extent of establishing his case by a preponderance of the evidence.

INJUNCTION — EQUITY — LACHES.

3. Defendant in a suit to enjoin obstructing a river with a dam impeding the drainage of lands, may not urge the objection of laches because the suit was not brought at an earlier date, it being in no worse position for maintaining its defense, and having been involved in no expense or inconvenience on account of the delay, and the injurious effects of the dam having been complained of from the time of its obstruction, and a concession of a partial abatement thereof having been obtained through the insistence, the suit being brought three years later.

From Clackamas: THOMAS A. McBRIDE, Judge.

Suit for an injunction by August Krause against the Oregon Iron & Steel Company, resulting in a decree as prayed for, from which defendant appeals. AFFIRMED.

For appellant there was a brief over the names of *Geo. C. Brownell, Algernon S. Dresser,* and *Williams, Wood & Linthicum,* with an oral argument by *Mr. Stewart B. Linthicum* and *Mr. J. Couch Flanders.*

For respondent there was a brief over the names of *Cicero M. Idleman* and *Lionel R. Webster,* with an oral argument by *Mr. Idleman.*

MR. JUSTICE WOLVERTON delivered the opinion.

The defendant constructed a dam in the Tualitin River, in Clackamas County, in 1888, which it maintained in its original condition until 1894, when, on account of the complaints of landowners, farmers, and gardeners upon the lowlands along the river above, it was lowered and otherwise materially abated, and has been since preserved

in that state to the time of the institution of this suit, November 6, 1897. This general statement is subject to the qualification that certain flashboards were employed temporarily from time to time as convenience suggested for the purpose of raising it in either condition to a still greater height. The plaintiff is the owner of a tract of twenty-five acres of land near the river, which he alleges is drained by it and Rock Creek, a small tributary thereto; and that by reason of the obstruction caused by the dam the water is cast upon his land, and the drainage so impeded and retarded as to hinder and delay him in planting his crops until too late in the season for them to mature properly, to his irreparable damage. The Tualitin River, in its general character, is a tortuous and sluggish stream, extending many miles inland from its confluence with the Willamette. Much of the land along its course is of a swampy and marshy character, soft and spongy, and has been redeemed by drainage. Being so redeemed, it is very valuable for gardening and farming purposes. The land owned by plaintiff is of this character, it being formerly submerged by a swamp. Rock Creek is situated twelve or fifteen miles above the dam by the way the water runs, and plaintiff's land lies nearly a mile above its mouth, but near its course, and is drained by means of ditches and drains emptying into it. It has been quite definitely established, and in fact is scarcely controverted, that prior to the erection of the dam in 1888 plaintiff was not hindered in the planting of his crops in the spring by reason of the water remaining on his land, but that the drainage was ample to carry it away in regular course after the spring rains had subsided. The dam was originally built to enable the defendant to float cord wood through a canal constructed from the river some three or three and one half miles above to Sucker Lake, thence to defendant's plant, which had the effect of backing the water up in the main stream

a long distance above. The exact extent to which it retarded the flow therein and cast the water back upon the lands along its course is difficult to determine, but that it was seriously impeded in the usual and natural discharge there can be no possible doubt. It is in evidence that when the dam was completed in 1888, which was in the latter part of the summer, the water at Scholl's Ferry, twenty-five miles above, was raised twenty-five inches, and at the mouth of Rock Creek from three to three and one half feet. This we accept as reliable, for there is nothing of moment to contradict it, and the river was rendered navigable for small steamboats and other light craft.

From the best proofs we have in the record, it appears that the dam was first constructed at a height of five feet above the bed of the stream, for a distance of 100 feet, and upon either end of this space it was raised by steps to a height still above that, approximating six feet at the margin of the stream; the entire length being about 250 feet. The main span was built of sawed timbers, twelve by twelve inches, five of these being placed one above the other, with perhaps a decking over all. Above this the company also used a couple of flashboards, which together were twenty inches in width, with which to raise the dam when it was desired, and when both were in use they increased its height to six feet eight inches, or more. It is a conceded fact that the use of the dam in this mode and condition was very detrimental to the farmers and gardeners on the stream above, because in 1894, after a conference was had with a number of them so affected, the defendant agreed to and did lower it for a space of 200 feet, so that it stood two feet lower than the 100-foot space as originally constructed; but it was still stepped up at the margins of the stream at either end of the 200-foot space. This was done by taking two tiers of timbers off of the 100-foot space and lowering the additional 100 feet to its level.

How the wings were reconstructed does not appear.  This left the dam still consisting of three tiers of these timbers, placed one above the other, and upon this was a four-inch decking, so that it was approximately three feet four inches in height at its lowest space.  The defendant, however, continued the use of the flashboards of the same width as before, when convenient, and permitted others to use them.  These statements we make in the nature of conclusions of fact, deeming them so clearly established that it would be a work of supererogation to attempt to summarize and comment upon the testimony adduced tending for or against their support.  We may simply allude to the following named witnesses testifying with relation thereto : Charles Porter, E. A. Eddy, John L. Smith, E. Savage, August Krause, F. Groner, Fred Fredericks, A. J. Hess, and William Jergens.

From a survey made of Rock Creek for drainage purposes prior to the building of the dam, it was ascertained to have a fall of from three to three and one half feet from a certain road mentioned in the evidence down to the mouth of the stream, where it empties into the Tualitin River.  Plaintiff's place is seventy or eighty rods above the road.  At the crossing of the creek there is a bridge, nearly a mile from the river.  From this data we are enabled to get some idea of the influence of the dam upon the drainage of plaintiff's premises.  We have seen from the evidence that the dam as originally constructed raised the Tualitin at the mouth of Rock Creek from three to three and one half feet, which was sufficient to set the water back up the creek a considerable distance, if not to the road ; several witnesses indicating that it was cast back a mile, or nearly to the bridge, and that a foot more would have carried it upon the plaintiff's premises ; one affirming that it checked the fall entirely ; and it needs no demonstration to prove that it would materially stifle and prevent the requisite drain-

age so necessary to the successful cultivation of his land. The dam was subsequently lowered two feet, however. This would leave some rise in Rock Creek — from a foot to a foot and a half above the normal condition. There appear to have been a series of riffles, five in number, originally in the main stream, the lowest being some four miles above the dam and the highest above the town of Tualitin. The condition was such that John L. Smith, a witness for defendant, could not run his scow, drawing fourteen inches, over one of them, but, in order to accomplish his purpose, he obtained permission of defendant to put the flashboards upon the dam, and on doing so he secured the required depth. This was in the summer of 1897. Measurements were taken at the time twenty or thirty rods below the mouth of Rock Creek to ascertain what effect the flashboards had on the stream at that point, and it was found that when the water stood nineteen inches on the flashboards it was raised nine inches at the point designated, thus showing the direct effect of raising the dam on the stream above at Rock Creek. One of the witnesses, in answer to a question whether they put in those flashboards whenever they chose, pointedly states his objection as follows: "Yes, sir; whenever they feel like it. That is the reason I want that dam out. I don't want any flashboards on that dam."

1. Witnesses for the plaintiff, however, generally concur in their testimony that the dam in its present condition and as maintained and controlled impedes very materially the flow of the water in the Tualitin, and consequently the drainage from the low and previously overflowed lands along and near its course, and retards the planting of crops thereon from one to three and four weeks in the spring, to the manifest injury of the owners year by year; some years greater, and at others less. Such an injury is irreparable, because insusceptible of definite ascertainment

and exact redress, and affords proper cause for equitable interference through the injunctive process. There is testimony contradictory of this, but we are unable to accord it to equal weight, so that the preponderance of the evidence is clearly in favor of the conditions thus indicated. It stands to reason that a sluggish stream affords a tardy drainage at best, and that the difficulty is heightened in direct proportion as the stream is obstructed and the current clogged and checked, and we have no doubt that the dam as at present constructed and maintained, considering as well the use of the flashboards, interferes appreciably with the plaintiff in planting and producing his crops. At what particular height it can be maintained without injuring him is not so clear. Relatively speaking, a two-foot dam would affect Rock Creek but slightly, and we entirely agree with the judgment of the learned trial court that it ought to be abated to that height from the lowermost portion of the bed of the stream, and be so maintained continuously. The decree should therefore be affirmed.

It should be stated that many individuals are affected similarly to the plaintiff, and that, although not parties to this suit, they have contributed to its prosecution for the purpose of obtaining an abatement of any obstruction of Tualitin River by the defendant resulting to their detriment.

2. Defendant's counsel contend that, to be successful, plaintiff should make out his case by clear and convincing proof, and that otherwise the court ought not to interfere with defendant's maintenance of its dam. The rule sought to be invoked, however, is not applicable here. The defendant owes to the plaintiff and other landowners whose crops are dependent upon the proper drainage of the soil in which they are produced a duty to see that it does not trespass upon their prior acquired rights and

privileges, and it can proceed with its obstructions of the stream just so far only as not to impinge upon these rights and privileges. The case sought to be maintained is a continuing trespass, and there exists no reason here whatever why a stronger rule should be applied against plaintiff than the usual one — that the party making the better case by the preponderance of the testimony is entitled to prevail.

3. It is urged also that the plaintiff has been guilty of laches in not instituting his suit sooner, and ought not to succeed on that account. It appears, however, that the dam has been a disturbing factor with these people along the Tualitin River ever since it was first constructed, and they have not since ceased to complain of its injurious effects. Such was their insistence in 1894 that they obtained a concession of a partial abatement of the obstruction. But this proved to be inadequate, and within a little over three years later this suit was begun. The defendant has been involved in no expense or inconvenience on account of the delay in instituting the suit, and is clearly in no worse position for maintaining its defense now than if the suit had been brought at an earlier date. The position is therefore untenable.

The form of the decree is unobjectionable. The words " beginning from the lowermost portion thereof" should be construed as meaning from the lowermost portion of the bed of stream ; not from the lowest depth of some hole or sudden depression therein, but from the lowermost part of the general contour of the channel. The twelve-inch timbers presumably rest on the bed, and they should not be constructed to a height greater than two feet from the lowest part of the general contour.     AFFIRMED.